UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

DANIEL G. ANDERSON; WILLIAM     :
COLLITON, M.D.; RICHARD P.     :
DELANEY, M.D.; GAETANO     :
MOLINARI, M.D.; RICHARD LORIA,     :
M.D.; LORENZO MARCOLIN, M.D.;     :
JAMES RONAN, M.D.; EDWARD     :
SHERIDAN, M.D.; EDWARD SOMA,     :
M.D.; and RONALD UCINSKI, M.D.,     :
    :
            Plaintiffs,     :
    :
v.     :    CASE:  PJM 10-CV-0017
    :
BARACK HUSSEIN OBAMA, in his     :
official capacity as President of the United     :
States,     :    **FIRST AMENDED**
    :        **COMPLAINT**
            Defendant.     :

Plaintiffs, by way of complaint against the Defendant, allege the

following:

## NATURE OF ACTION

1.     This is an action for declaratory, injunctive and other

necessary and appropriate relief, brought under the Declaratory

Judgment Act, 28 U.S.C. § 2201 et seq., seeking  (1) a declaratory

judgment that the actions of the Defendant, President Barack Obama, and

1

the members of his White House staff in intimidating and coercing Senator

Ben Nelson of Nebraska to vote in favor of the Senate health care reform bill

known as the Patient Protection and Affordable Care Act (H.R. 3590),

and/or to vote in favor of a measure to cut off all further debate on such bill,

by threatening to take executive actions detrimental to the citizens of

Nebraska are (a) ultra vires acts in excess of the powers of the President, (b)

an usurpation, absorption and use of constitutional legislative powers

confided exclusively to Congress in violation of the doctrine of separation of

powers, and (c) render any resulting reconciled or merged health care reform

bill presented by Congress to the President null and void as a product of

such ultra vires and unconstitutional acts, and (2) the entry of an

injunction directing and ordering Defendant President Obama to

cease and desist from undertaking in the future to intimidate and coerce

any member of the Congress to vote in favor of any health care bill,

including the bill to be reported out of the House-Senate Conference, and/or

to vote in favor of cutting off debate on any such bill by making threats to

take executive action or actions that adversely affect the member's

constituents, or, in the alternative, enjoining the enforcement of any resulting

reconciled or merged health care reform bill that is presented by Congress to

the President and that is signed by the President.

## PARTIES

2. Plaintiff Daniel G. Anderson, a citizen of Maryland who resides in Chevy Chase, Maryland, and who holds a degree in economics from Yale University, is a former officer in the U.S. Navy and veteran of the Korean War, and is now retired.

3. Plaintiff William Colliton, M.D., a citizen of Maryland who resides in Bethesda, Maryland, is currently a Clinical Professor of Obstetrics and Gynecology at George Washington University Medical Center in Washington, D.C.

4. Plaintiff Richard P. Delaney, M.D., is a citizen of Maryland who resides in Silver Spring, Maryland, and is currently a General Practitioner with an active family practice of over fifty (50) years.

5. Plaintiff Richard Loria, M.D., is a citizen of Virginia who resides in McLean, Virginia, whose medical specialty is Allergy and Immunology, and who currently works as a lecturer to the medical profession.

6. Plaintiff Lorenzo Marcolin, M.D., is a citizen of Maryland who resides in Potomac, Maryland, and is an orthopedic physician.

7. Plaintiff Gaetano Molinari, M.D., is a citizen of Maryland who resides in Chevy Chase, Maryland, and is currently a Neurologist and the

Chairman Emeritus of the Department of Neurology at George Washington University in Washington, D.C.

8.  Plaintiff James Ronan, M.D., is a citizen of Maryland who resides in Potomac, Maryland, and is a cardiologist and the author of cardiology textbooks that are used in the medical profession.

9.  Plaintiff Edward Sheridan, M.D., a citizen and resident of Washington, D.C., is a psychiatrist and the former Chairman of the Department of Psychiatry at Georgetown University.

10.  Plaintiff Edward Soma, M.D., is a citizen of Maryland who resides in Kensington, Maryland, and is a radiologist, the Founding Chairman of the Department of Radiology and Nuclear Medicine of Holy Cross Hospital, and the former Chairman of the Board of the St. Jude's Hospital in Memphis, Tennessee.

11.  Plaintiff Ronald Ucinski, M.D., is a citizen of Virginia who resides in Great Falls, Virginia, is a neurosurgeon and a graduate of the Georgetown University School of Medicine, a Senior Surgeon with the U.S. Public Health Service, and an Assistant Professor in the Department of Neurological Surgery, Georgetown University and George Washington University.

12. Defendant Barack Hussein Obama is the President of the United States.

## JURISDICTION AND VENUE

13. Jurisdiction over this action is conferred by the federal question jurisdiction statute, 28 U.S.C. § 1331.

14. Venue is properly laid in this Court by virtue of 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

15. The Patient Protection and Affordable Care Act (H.R. 3590), hereinafter the Senate Bill, is a Senate health care reform bill that was introduced on the floor of the Senate on November 18, 2009.

16. On December 21, 2009, the Senate voted to cut off all further debate on the Senate Bill by a vote of 60 to 40, thereby ending a Republican filibuster of the Senate Bill.

17. On December 24, 2009, the Senate voted to pass the bill by a vote of 60 to 39, with only Jim Bunning (R-KY) failing to vote.

18. On information and belief, in December 2009 prior to the aforementioned Senate votes, Defendant President Barack Obama and/or members of his White House Staff met in closed-door sessions with Senator Ben Nelson (D-NE) on several occasions.

19. On information and belief, during one or more of these closed-door meetings, Defendant President Obama and/or members of the White House staff with the knowledge and approval of the President, threatened to put Offutt Air Force Base on the Base Realignment and Closure (BRAC) list, thus slating the base for closure, unless Senator Nelson voted in favor of the Senate Bill and/or voted in favor of cutting off all further debate on the Senate Bill.

20. Offutt Air Force Base employs approximately 10,000 military and federal employees in Southeastern Nebraska and it is the headquarters of the Strategic Command (STRATCOM), the successor to the Strategic Air Command.

21. On information and belief, a Senate aide to Senator Ben Nelson stated that the threat to place Offutt Air Force Base on the BRAC list was "a naked effort by Rahm Emanuel and the White House to extort Nelson's vote" and that the White House was "threatening to close a base vital to national security for what?"

22. On information and belief, President Obama and Chief of Staff Rahm Emmanuel have participated in the negotiations between the Senate and House members invited to the Cabinet Room off of the Oval Office the week of January 11 in an attempt to bring about a reconciliation that would be amenable to the President.

## COUNT I - ULTRA VIRES CONDUCT

23. Plaintiffs hereby incorporate the allegations of Paragraphs 1 through 22 of their Complaint as if fully set forth herein at length.

24. Article II of the United States Constitution provides in part that "[t]he executive Power shall be vested in a President . . ."; that "he shall take Care that the Laws be faithfully executed"; and that he "shall be Commander in Chief of the Army and Navy of the United States."

25. Article II, Section 3 of the Constitution further requires that the President "from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient." Subsumed within this Article II, Section 3 directive is a requirement not to foment division between the States.

26. The President also has a constitutional veto power. Specifically, after a bill has passed both Houses of Congress, but "before it becomes a

Law," the bill must be presented to the President. If he approves, "he shall sign it, but if not he shall return it, with his Objections to that House in which it shall have originated, who shall enter the objections at large on their Journal, and shall proceed to reconsider it." U.S. Const., Art. I, § 7, cl. 2. The President's "return" of a bill, which is commonly described as a veto, can be overridden by a two-thirds vote in each house.

27. In the framework of the Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker.

28. The Constitution limits the President's functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad.

29. The Constitution is neither silent nor equivocal about who shall make laws that the President is to execute: Article I of the Constitution provides that, "All legislative powers herein granted shall be vested in a Congress of the United States . . . ," and further provides that Congress may "make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof."

30. The Constitution does not subject this exclusive lawmaking power of Congress to presidential supervision or control.

31. The President admittedly can help shape legislation prior to its presentment to him for signature. Through statements of administration policy, staff and presidential discussions with members of Congress wherein the views of the President and the arguments in favor of those views are made known to such members, and public statements, the President can influence legislation.

32. In addition, the President, pursuant to his Article I power to veto legislation, may prior to presentment threaten to veto legislation that contains what he considers to be unconstitutional provisions, or provisions that he objects to on policy grounds, and may thereby convince or coerce Congress to remove those provisions.

33. Aside from his authority to issue veto threats, however, the President cannot, prior to presentment, use a threat to exercise an otherwise legitimate executive power, confided to him under Article II of the Constitution, to intimidate or coerce individual members of the House of Representatives, or to intimidate or coerce individual members of the Senate, in the exercise of their exclusive constitutional authority to make

laws, without improperly exceeding his authority under the Constitution and thereby acting ultra vires.

34. Decisions as to whether or not to vote for a particular bill, or whether or not to vote to cut off debate on a bill, are exclusively legislative decisions for the members of Congress to make, and therefore it constitutes a breach of trust and an abuse of the power confided in the President for the President to attempt to impose his views on the members of Congress that a particular bill should become law, or that debate on a particular bill should be cut off, through coercion or intimidation of individual members of Congress, including by threatening to take executive action that adversely affects a member's House District or State unless that member votes in favor of a particular bill.

35. On information and belief, in or about December 2009 President Obama and/or one or more of the members of his White House Staff acting with his knowledge and approval, during one or more closed-door meetings, threatened a member of the United States Senate, namely Senator Ben Nelson of Nebraska, that the President would take action to shut down the Strategic Command base currently located within the State of Nebraska, with an attendant loss of thousands of jobs and millions of dollars of revenue to that State, unless Senator Nelson voted in favor of passage of the Senate

Bill and/or voted in favor of a measure to cut off all debate on the Senate Bill.

36.   In threatening to take executive action adverse to the State of Nebraska unless Senator Nelson voted in favor of passage of the Senate Bill, the President abused his authority and acted in excess of his powers under the Constitution.

37.   The Senate subsequently, on December 21, 2009, passed a measure to cut off debate on the Senate health care reform bill by a vote of 60 to 40.  Senator Nelson voted in favor of this measure.

38.   Thereafter, on December 24, 2009, the Senate voted to pass the Senate health care bill by a vote of 60 to 39.  Senator Nelson voted in favor of passage of the bill.

39.   The Senate Bill must now be reconciled with a related House Bill (H.R. 3962, the Affordable Health Care for America Act) at a House-Senate conference, and the resulting reconciled bill to be reported out of the conference committee must be voted on again by both the House and the Senate.

40.   Formal negotiations between conferees from the House and Senate regarding the reconciliation of the House Bill with the Senate Bill are scheduled to commence the first week of January 2010.

41. On information and belief, one or more members of the White House staff have made public statements that the President will be more closely involved than ever before in the legislative process regarding the House-Senate conference negotiations and the final House and Senate votes on the health care reform bill to be reported out of conference committee. The *Wall Street Journal* has reported that "Democratic leaders are already saying that this won't be the usual conference, with public votes, but will be negotiated by a few barons *plus White House Chief of Staff Rahm Emanuel* in a backroom." (Wall Street Journal, Review & Outlook, "The Senate Postmortem," p. A10, c. 1, Dec. 26-27, 2009 (emphasis added), attached hereto as Exhibit "B".) The *Baltimore Sun* similarly has reported that "[m]embers of the Obama administration, including the White House chief of staff Rahm Emanuel will also be heavily involved in the talks" to reconcile the House Bill with the Senate Bill. (The Baltimore Sun, News, "After passing 2 health bills, hill must now build bridge," p. 14, c. 1, Dec. 27, 2009, attached hereto as Exhibit "C".) The *Baltimore Sun* further reports that White House Deputy Press Secretary Bill Burton has said that, "We've got two bills, one in the House, one in the Senate, they're 95 percent similar. *We're going to be actively working to iron out the rest of the differences and get a bill passed* and signed." (*Id.* (emphasis added).)

42. On information and belief, the President and his Chief of Staff have engaged in ultra vires acts by inviting AFL-CIO President Trunka, AFSCME President McEntee, and other union heads to participate in the Congressional reconciliation conference process as if that process is a collective bargaining one wherein certain special interests are given a privileged place at the table instead of their having to present their interests to individual legislators in the same manner as the rest of the American people.

43. On information and belief, there is an imminent danger that the President will again engage in ultra vires acts of threatening one or more members of Congress with executive action adverse to their constituents unless those members vote in favor of the reconciled bill to be reported out of conference committee and/or vote in favor of cutting off debate on such reconciled bill.

44. The Declaratory Judgment Act authorizes this Court, "[i]n a case of actual controversy within its jurisdiction, . . . [to] declare the rights and other legal relations of any interested party seeking such declaration," and to grant "[f]urther necessary or proper relief" based on such declaratory judgment, *see* 28 U.S.C. §§ 2201, 2202.

45. The plaintiff physicians are "interested parties" as they will be adversely affected in the practice of their profession by the final passage of either the House Bill or the Senate Bill, or by a reconciled bill that contains most of the provisions form either one or both of those bills.

46. Plaintiff Richard P. Delaney, M.D., in his affidavit attached hereto as Exhibit "A," has summarized the adverse effects that would result from the passage of the House Bill, or of the Senate Bill, or of a combination of the two.

WHEREFORE, Plaintiffs pray for the entry of judgment against the Defendant President Barack Hussein Obama

(A)    Declaring that the actions of the President and the members of his White House staff in intimidating and coercing Senator Ben Nelson to vote in favor of the Senate Bill and/or to vote in favor of cutting off further debate of the Senate Bill by threatening to take executive actions detrimental to the citizens of Nebraska are ultra vires acts in excess of the powers of the President;

(B)     Declaring any resulting reconciled or merged health care reform

bill presented by Congress to the President to be null and void as a

product of such ultra vires and unconstitutional acts;

(C)     Enjoining the President and the members of his White House

staff, including all agents and employees of the President and the

White House staff, from undertaking in the future to intimidate and

coerce any member of the Congress to vote in favor of any other

health care reform bill, including the health care bill to be reported out

of conference, or to vote in favor of cutting off further debate on any

such bill, by making threats to take executive action or actions that

adversely affect the member's constituents;

(D)     Enjoining the enforcement of any resulting reconciled or

merged health care bill that is presented by Congress to the President

and is signed by the President; and

(E)     For such additional and further relief as may be just or

equitable.

## COUNT II - VIOLATION OF SEPARATION OF POWERS

47. Plaintiffs hereby incorporate the allegations of Paragraphs 1

through 46 of their Complaint as if fully set forth herein at length.

48. The principle of separation of powers, although not expressed in the Constitution in so many words, underlies and undergirds it.

49. As Mr. Justice Brandeis once wrote, "[t]he doctrine of separation of powers was adopted by the Convention of 1787, not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was, not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy." *Myers v. United States*, 272 U.S. 52, 240, 293 (1926) (Brandeis, J., dissenting).

50. In Federalist No. 47, James Madison observed that, "*There can be no liberty where the legislative and executive powers are united in the same person* or body of magistrates . . . . The magistrate in whom the whole executive power resides cannot of himself make a law, though he can put a negative on every law . . .." (Emphasis added.)

51. In 1792, Thomas Jefferson related how he told President George Washington that "if the equilibrium of the three great bodies, Legislative, Executive and Judiciary, could be preserved, if the Legislature could be kept independent, I should never fear the result of such a government; but that *I could not but be uneasy when I saw that the Executive had swallowed up the Legislative branch.*"

52. In his concurring opinion in *Youngstown Sheet & Tube v. Sawyer*, 343 U.S. 579, 629, 633 (1952), Justice Douglas observed: "The tragedy of such stalemates might be avoided by allowing the President use of some legislative authority. *The Framers with memories of the tyrannies produced by a blending of executive and legislative power rejected that political arrangement*. . . . Such a step would most assuredly alter the pattern of the Constitution."

53. A President cannot use or abuse his constitutional executive powers as leverage to gain control over the exercise of the constitutional legislative powers of Congress without improperly blending executive and legislative power and concentrating such dual power in the Executive branch, in violation of the doctrine of separation of powers.

54. President Obama, by using or abusing his executive powers to coerce an individual member of the Senate to vote in favor of the Senate Bill and/or to vote in favor of cutting off all further debate on the Senate Bill and, by this action, implicitly sending a message that he is prepared, if necessary, to engage in further coercion of members of Congress to pass the reconciled health care reform bill that will be reported out of the House-Senate conference committee, has sought to usurp, absorb, gain control over

and/or use the exclusive legislative authority of Congress in violation of the doctrine of separation of powers.

55.   To avoid the Executive from swallowing up the Legislative branch, the President must be restrained from engaging in the use or abuse of his executive powers to coerce individual members of Congress to vote in favor of any health care reform bill that the President favors, or in favor of cutting off debate on any health care reform bill that the President favors.

56.   That by inviting President Trunka of the AFL-CIO and President McEntee of the AFSCME, and other union heads to participate in the Congressional negotiations designed to reconcile the Senate and House versions of H.R. 35990, the President has unconstitutionally delegated legislative power to private labor unions contrary to Article I, Section 1 of the Constitution which vests all legislative power in a Congress of the United States and contrary to Article II, Section 1 which vests the President only with executive power, thereby usurping the power of the people to amend the Constitution contrary to the process prescribed in Article V of the Constitution.

WHEREFORE, Plaintiffs pray for the entry of judgment against the Defendant President Barack Hussein Obama

(A)     Declaring that the actions of the President and the members of his White House staff in intimidating and coercing Senator Ben Nelson to vote in favor of the Senate Bill and/or to vote in favor of cutting off further debate on the Senate Bill by threatening to take executive actions detrimental to the citizens of Nebraska unconstitutionally have usurped, swallowed and absorbed the powers of the Legislative branch of the Government in violation of the doctrine of the separation of powers;

(B)     Declaring any resulting reconciled or merged health care reform bill presented by Congress to the President to be null and void as a product of such ultra vires and unconstitutional acts;

(C)     Enjoining the President and the members of his White House staff, including all agents and employees of the President and the White House staff, from undertaking in the future to intimidate and coerce any member of the Congress to vote in favor of any health care bill, including the health care bill to be reported out of conference, or to cut off debate on any such bill by making threats to take executive action or actions that adversely affect the member's constituents;

(D)     Enjoining the enforcement of any resulting reconciled or

merged health care reform bill that is presented by Congress to the

President and is signed by the President; and

(E)     For such additional and further relief as may be just or

equitable.

*Rudolph Martin Palmer*

Rudolph Martin Palmer, Jr.
Bar No. 03594
Law Office of Martin Palmer
21 Summit Avenue
Hagerstown, MD 21740
(301) 790-0640
(301) 790-0684 (Facsimile)
info@martinpalmer.com
Attorney for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

DANIEL G. ANDERSON, et al.,    )
    )
    )
    Plaintiffs    )
    )   Civil Case No._____
    v.    )
    )
BARACK OBAMA,    )
    )
    Defendant    )

### AFFIDAVIT

STATE OF MARYLAND, COUNTY OF WASHINGTON, to-wit:

COMES NOW, RICHARD P. DELANEY, M.D., and makes affidavit as follows:

Diogenese would be distressed in today's America.  His claim was that virtue is the only good and that all else can be good only within the context of virtue.  The story runs that he searched in vain for the honest man.  That was Athens two thousand years ago.  Should he roam the halls of our Capitol today with his legendary lamp, it would not penetrate the murk of the locked door, bribery strewn, shady deals destroying American medicine as our doctors have known and practiced it these many years.  They are destroying, in fact, a way of life; literally.  There are many paths to the concentration of power in a centralized government.  The present Administration and Congressional majority seems to be trying them all.  The socialization of medicine is probably the most efficient tool in achieving that lamentable end.  I deplore the loss of the practice of medicine as we have known it and the harm that socialized medicine will do to my patients.

We are now engaged in a clatter of debates resulting, I believe, from the atrophy of our social fiber.  Perhaps the most glaring, the most dangerous debate involves that unavoidable problem, that eventuality which intrudes on our lives in the best and worst of times.  I speak of the burden of sickness.  It is a question of how and why a sick person seeks out his trusted physician when sickness visits uninvited.  Sickness is intensely personal.  It shrinks from statistics and generalities.  When

you are sick or have a reason to think that you are, there comes
about a type of isolation, a derailment of a sort.  You have a
need to get your life back on the right track.  You seek the
help of the doctor who knows you.  You trust him to know what to
do; when and how to do it.  If it is beyond his ability, you can
trust him to find the needed specialty care.  The tendency to
refer to a doctor as "my doctor" is an expression of that
personal trust.  He knows you, and you can be sure that he has
your best interests behind his decisions.  The bond between the
patient and the physician has been bound by sacred oath for over
two thousand years.  The oath of Hippocrates still applies, and
the patient rightly expects no less.

Ordinarily, as in the case of an acute not so serious
illness, the path to wellness may be an easy one.  The sore
throat or bruised knee is easily diagnosed, treated and just as
easily forgotten.  It may be, though, that the illness is
chronic as in diabetes or high blood pressure.  The path then to
a normal life involves altering some habits, taking needed drugs
and periodic monitoring.  Personal life then proceeds basically
unaltered.  However the diagnosis may also be of an incurable
illness with a prognosis of the patient dying within a certain
period of time.  It is here that the physician who has known us
in our acute and chronic illnesses has come to have an awareness
of our family, friends and way of being.  It is precisely here
that **"my doctor"** is best able to come to my aid and see me
through . . . whatever the circumstances.  This is said, and
needs to be said, to point out that the doctor-patient
relationship carries with it an incalculable value and
responsibility.  It is a value not to be denied without doing
grave injustice.  Strangely, that bond between the doctor and
the sick person is barely mentioned in the thousands of
unexamined pages of "medical reform."  Yet it is here exactly
that the art and science of medicine meets and is made present
to the person who needs it now.  Think about that.

In my life of medical practice extending over half a
century, I have never experienced a situation in which a patient
was denied treatment because of poverty.  A typical expression
to the specialist when referring such a patient might have been:
"You will have to do this one for the glory of God."  I have
never had a refusal.  Hospitals have also extended the
proverbial helping hand with needed rate reductions or complete
elimination of fees.  For the mere asking, my own hospital has
accepted carte blanche several patients even imported from poor
foreign countries specifically for diagnosis and treatment.  No
question of payment was ever raised.  It cannot have been a

unique occurrence.  Physician friends, some of whom have
retired, continue regular schedules, dedicating their impressive
skills (completely on a voluntary basis) to caring for the poor.
They have maintained their licenses specifically for this
purpose.  There are several such groups of doctors in our area,
and I have not the slightest doubt that the practice is repeated
across the nation.  Such is the bond of a doctor and patient,
and such is the dedication of the American doctor to his art and
its practice.

The multiple so-called "medical reform" plans coming out of
Congress have nothing in the slightest to do with American
medicine except to insure its demise while concentrating power
in a centralized federal government.  Without doubt, it will
eliminate that sacred binding of the dedicated physician and the
sick patient.  It will certainly insure that doctors who can
retire will do so as quickly as possible, and they will remain
retired.  The sick patient will be forced into an impersonal
system.  It will be a system that knows not his name and is
operated by clock-watching civil servants.  You will take your
turn and wait your turn with your waiting extending to months or
even years.  That onerous system is plainly to be seen all over
the world where socialized medicine is practiced.  The evidence
is clear.  You have only to examine it.  I need not boast of the
quality of medicine practiced in our America.  It speaks volumes
for itself, and we are justified in being proud of it.  It will
be missed.

There are worlds more to learn about this art than when I
went to medical school a half century (and then some) ago.  The
learning tree is higher, and it is correspondingly harder to
climb.  Fewer young students will be motivated to make that
climb merely to become a government functionary.  They will be
asked to become the tool of a plan or an amalgam of plans that
our elected representatives passed without even bothering to
read.  It is a plan passed with the urging of twisted arms, pork
barrel handouts and odious bribes.  It is a plan deviously
enacted in midnight sessions that could not stand the light of
day.  The budding physician will look forward to a career as a
system functionary beholden to a civil service regime more
interested in the concentration of power into its own hands than
in the helping of the sick.  If there is anyone who believes
that this socialized structure is designed to attract and
encourage bright young Americans to embrace the rigors of
medical education, I marvel at his credulity.  Since
socialization of medicine has nothing to do with medicine and
everything to do with socialism and the concentration of power

in the state, better it might be to go to law school and try to get elected to Congress.

Yes, we have indeed changed in many ways.  It must be so. Yet, there are facets of culture that are embedded in truth and must not change.  They provide the framework for our code of morality necessary for our continued adherence to life, liberty and the pursuit of happiness.

We physicians question deeply that the framers of our Constitution had any thought of denying free citizens access to the legitimate medical care of their own choosing.

We deny that Congress is privileged to force physicians to practice medicine deficiently as would be mandated by currently proposed health care plans.

We deny that this usurpation of power and denial of freedom is embedded in any way in our Constitution.

We hereby beg that the constitutionality of government imposition into medicine be affirmed or denied by our unelected judiciary before being signed into law.

_____

Richard P. Delaney, M.D.


State of Maryland
County of Washington

Subscribed and sworn to before me this _____ day of _____, 2010, at Hagerstown, Maryland.

_____

Notary Public


My Commission Expires:

4/21/2012

EXHIBIT B

OPINIO

## REVIEW & OUTLOOK

# The Senate Postmortem

In the post-dawn hours on Thursday the Senate passed ObamaCare 60 to 39, in the first vote on Christmas Eve since 1895 and after the longest consecutive session in Congress since World War I. We are thus heading toward the first U.S. entitlement program dragged across the finish line on a straight partisan majority, a bill that even its most fervent supporters admit is "flawed" but better than nothing.

It is far worse than nothing. The bill itself is an unprecedented arrogation of federal power over one-seventh of the economy, and even its closest antecedents, Medicare and Medicaid, passed in 1965 with the support of both parties. Reflecting the political consensus that has always inspired durable social reform in America, those entitlements cleared the Senate with more than half of the GOP caucus voting in favor.

It takes hard partisan work to drive off Olympia Snowe, Susan Collins, Chuck Grassley, Orrin Hatch, John McCain, Bob Bennett, Judd Gregg, Mike Enzi and the Senate's other Republican moderates or deal-makers who earlier this year were prepared to compromise. Some 18 Senate Republicans voted to more than double the size of the children's health insurance program in 2007 over the opposition of President Bush, and Mrs. Snowe and Messrs. Grassley and Hatch and others have long joined with Democrats for health-care subsidy expansions that most Republicans dislike. The GOP had no choice but to oppose this plan or completely abandon its principles.

Mrs. Snowe in particular genuinely wanted to support reform, and she voted to send the Finance Committee version to the floor in October. Majority Leader Harry Reid promptly tacked hard to the left, trying, among other things, to resurrect the government-run "public option" that was untenable among Democratic moderates and even the White House had long ago left for dead.

The bill Democrats approved on Christmas Eve was drafted "in the shadows, without transparency, just to garner the necessary 60 votes and nothing more," as Mrs. Snowe put it in a statement on Sunday. A law so sweeping and complex that no one can understand it but that will affect the lives of all Americans was thus rushed to passage with little real debate, and less reflection. The Senate considered only 20 of the more than 450 amendments filed.

Those votes were revealing nonetheless, showing that certain Democrats oppose core

**Every Democrat cast the deciding health-care vote.**

parts of ObamaCare even as they voted for the final version. Nebraska's Ben Nelson—now justly famous for a Medicaid payoff in return for his vote—and Virginia's Jim Webb voted for the McCain amendment that would have stripped out cuts totaling more than $400 billion in future Medicare spending to fund "universal" health insurance. Along with Blanche Lincoln (Arkansas) and Evan Bayh (Indiana), the duo also supported changes that would have excluded tax increases on individuals earning under $200,000, as President Obama promised during his campaign. The tax amendment failed, 45-54.

So these Senators were against the heart of the bill before they voted for it, as John Kerry has been known to say.

In remarks on Monday after a crucial late night cloture vote to meet an arbitrary Christmas deadline, Mr. Obama added that "Medicare will be stronger and its solvency extended by nearly a decade." But as the Congressional Budget Office noted in a memo on Wednesday, the claim isn't true except on paper, since money taken out of the accounting gimmick of the "trust fund" to pay for subsidies today can't simultaneously be spent on Medicare benefits tomorrow. Messrs. Bayh, Nelson and Webb voted in favor of an amendment sponsored by Mr. Gregg that would have eliminated this double counting.

These Democratic fence-sitters and Joe Lieberman ended up killing the public option, but in the end they gave Mr. Reid and the White House what they needed. We trust voters in Nebraska, Louisiana, Indiana, Virginia and elsewhere noticed that these votes ultimately ensured the passage of a bill that will increase insurance costs, retard medical innovation and sorely damage the country's fiscal position.

And it may get worse before it becomes law. The left has thrown a faux tantrum over the Senate bill, hoping to leverage changes toward even higher costs and taxes as it now goes to House-Senate conference. Democratic leaders are already saying this won't be the usual conference, with public votes, but will be negotiated by a few barons plus White House chief of staff Rahm Emanuel in a backroom. Whatever changes they make to appease the left will be sprung on everyone else and once again rushed through both houses, à la the Senate bill.

Every Democrat in the Senate cast the deciding vote for this spectacle, which will soon give them ownership of the U.S. health-care system.

NATION

THE BALTIMORE SUN | NEWS 3 | SUNDAY, DECEMBER 27, 2009

EXHIBIT 6 (PAGE 1)

# After passing 2 health bills, Hill must now build bridge

## Aligning House and Senate plans is no small hurdle

**By James Oliphant**
TRIBUNE NEWSPAPERS

WASHINGTON — Even as Senate Democrats celebrated passing landmark health care legislation last week, they knew the arm-twisting and dealmaking wasn't close to being over.

The $871 billion Senate measure, which passed early Christmas Eve in a taut, party-line vote, now must be reconciled with a $1 trillion House version that passed in early November. While the two bills are more alike than different, working out the kinks won't be an entirely smooth process.

What form that process will take also remains unclear. Typically, differences are ironed out in a joint House-Senate conference committee. But last week, sentiments on Capitol Hill were moving away from such a formal structure in favor of a looser negotiating framework that could allow greater flexibility to fashion a compromise.

And because Republicans will play no role in shaping the final product, Democrats are free to do as they see fit — which could mean a handful of leaders from both houses, along with key committee chairs, will hammer out a deal behind closed doors with the goal of sending a bill to President Barack Obama by early February. Both the House and the Senate will have to vote again on the measure before that happens.

Members of the Obama administration, including the White House chief of staff, Rahm Emanuel, will also be heavily involved



JAY MALLIN/BLOOMBERG PHOTO

Assuming the differences between House and Senate health care legislation are ironed out, Senate Majority Leader Harry Reid, center, will still need the votes of every member of his caucus, including Max Baucus, left, and Christopher Dodd, to avoid a Republican filibuster.

Rahm Emanuel, will also be heavily involved in the talks.

"We've got two bills, one in the House, one in the Senate; they're 95 percent similar," White House deputy press secretary Bill Burton said Thursday. "We're going to be actively working to iron out the rest of the differences and get a bill passed and signed."

Regardless of the format, the Senate is expected to have the upper hand in any negotiations, because Senate Majority Leader Harry Reid, D-Nev., needs the vote of every one of the 58 members of his caucus along with the two independents in the chamber to ward off a Republican filibuster.

Senators such as Joe Lieberman, an independent from Connecticut, and Ben Nelson, a Democrat from Nebraska, whom Reid courted until the last minute, have already pledged to withdraw their support if the bill deviates too much from the Senate version.

For Reid and House Speaker Nancy Pelosi, D-Calif., the challenge will come in keeping Senate moderates on board without triggering defections from House liberals, who are aggrieved that the Senate bill dispensed with cherished provisions such as a government-run insurer — the "public option" — that would compete with private companies.

But no one on Capitol Hill seems to believe that the lack of a public option will be a deal-breaker. And Pelosi and other House leaders will have a simple message for intransigent members: Do you want a bill, or one who keeps a historic health care bill from the president's desk?

It's also possible that the more the final bill begins to resemble the Senate version, the greater the chance that some of the 39 centrist Democrats in the House who voted against the bill could come on board.

Both versions of the bill set up insurance exchanges, where people could buy health policies with the help of federal subsidies. Both expand the reach of the Medicaid program and both impose new rules on insurers, including prohibiting them from rejecting customers based on their medical history.

But there are some significant differences. A key sticking point in the talks may be the issue of abortion coverage and the federal subsidies. The more restrictive House bill prohibits anyone receiving subsidies from buying an individual policy that covers abortion through the new insurance exchange. The Senate bill would only prohibit the use of federal funds for such coverage and would require insurance companies to segregate public and private funds.

*Janet Hook of the Tribune Newspapers Washington Bureau contributed to this report.*

White House chief of staff Rahm Emanuel is expected to be deeply involved in legislative efforts to reconcile the House and Senate health care reform bills.

partially relies on taxes on high-end, so-called Cadillac insurance plans — a tax bitterly opposed by labor unions. The House bill imposes a surcharge on Americans who earn more than $500,000 a year and families earning more than $1 million.

House liberals may seek to extract some other changes to the Senate bill in return for jettisoning the public option, including increasing the amount of the subsidies or moving up the date the new insurance exchanges would take effect one year, to 2013.

How those exchanges would operate is another disparity: House Democrats want that exchange to be a national one, while the Senate bill calls for a state-based system.

The talks could be heated, especially after House leaders have pledged not to "roll over" for the Senate. But it was clear at the end of last week that even the liberals weren't drawing lines in the sand and were ready to deal.

"It doesn't have to be called a public option," said Rep. Lynn Woolsey, D-Calif., co-chairwoman of the Congressional Progressive Caucus. "The main issue for Democrats in the House is that exchange is affordability."



ALEX BRANDON/AP PHOTO

---

# Concessions made to gain Senate votes

## Lawmakers

**Sen. Ben Nelson,** D-Neb., who provided the crucial 60th vote that Senate Majority Leader Harry Reid needed, received numerous benefits for Nebraska, along with tighter curbs on abortion. Among the Nebraska-specific provisions:

■ The federal government will pick up the full cost of a proposed expansion of Medicaid, at an estimated cost of $100 million over 10 years.

■ Blue Cross/Blue Shield of Nebraska will be exempted from an annual fee on insurers; the exemption could also apply to nonprofit insurers in other states, possibly including Michigan.

■ Supplemental "Medigap" policies such as those sold by Mutual of Omaha are exempted from the annual fee on insurers.

■ A physician-owned hospital being built in Bellevue, Neb., could get referrals from doctors who own it, avoiding a new ban in the Senate bill that will apply to hospitals built in the future.

**Sen. Max Baucus,** D-Mont., chairman of the Finance Committee and a key architect of the legislation, put in a provision to give 2,900 residents of Libby, Mont., many of whom have asbestos-related illnesses from a now-defunct mineral mine, sickened residents could sign up for Medicare benefits.

**Sen. Chris Dodd,** D-Conn., chairman of the Banking Committee, added an item making $100 million available for construction of a hospital at a public university. The measure leaves it up to the Health and Human Services Department to decide where to spend the money. Dodd says more than a dozen sites could be eligible, but he hopes the University of Connecticut will be the beneficiary.

**Sen. Patrick Leahy,** D-Vt., negotiated $600 million in additional Medicaid benefits for his state over 10 years. He said Vermont is due the benefits because the state already has acted to expand Medicaid eligibility to the levels now contemplated by the federal government. Massachusetts is getting $500 million in Medicaid for similar reasons.

**Sen. Mary Landrieu,** D-La., a key moderate, withheld her support from the legislation until she was able to procure Medicaid help from the federal government worth at least $100 million in 2011.

**Sen. Bill Nelson,** D-Fla., pushed a provision he said will let about 800,000 Florida seniors enrolled in private Medicare Advantage plans keep their extra benefits. It also helps seniors in a handful of other states.

**Sen. Bernie Sanders,** I-Vt., who was angered after a new government-run health plan was dropped from the legislation to win over some moderate Democrats, held out on backing the bill until Reid agreed to a $10 billion increase in support for community health centers.

## Interest groups

**Longshoremen** were added to the list of high-risk professions shielded from the full impact of a new tax on high-value health insurance plans. Electrical linemen were also newly shielded, along with policemen, firefighters, other emergency first responders and workers in construction, mining, forestry, fishing and certain agricultural jobs.

**Gun-rights lobbyists** pushed for language to bar data collection on gun ownership in the bill.

**Construction industry** companies won language limiting their exposure to penalties on employers who do not provide affordable health insurance to their employees.

**The American Medical Association** announced its coveted endorsement Monday after changes including:

■ Eliminating a 5 percent tax on elective cosmetic surgery, replacing it with a 10 percent tax on indoor tanning services.

■ Eliminating payment cuts to specialty and other physicians that were to be used to pay for bonuses to primary care physicians and general surgeons in underserved areas. The bonuses remain.

■ Dropping a proposed fee on physicians who participate in Medicare. The $300 fee was to be used to fight fraud in the program.

**The pharmaceutical industry** scored victories including:

■ Makers of brand-name biotech drugs — expensive pharmaceuticals made from living cells — won 12 years of protection against would-be generic competitors.

■ Drugmakers fended off proposals to allow importation of cheaper drugs from Canada and other countries, and to let the government negotiate drug prices for Medicare recipients.

— Associated Press

EXHIBIT E pg